In re DONALD G. ATTEBERRY, DVM, P.A., Debtor.

DONALD G. ATTEBERRY, DVM, P.A., Plaintiff,

v.

BARCLAYS BANK PLC, Defendant.

Bankruptcy No. 91–40357–11. Adv. No. 91–7432.

United States Bankruptcy Court, D. Kansas.

Nov. 12, 1992.

N. Larry Bork, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for defendant.

J.B. King, Fisher, Patterson, Sayler & Smith, Topeka, KS, for debtor.

John Foulston, U.S. Trustee, Wichita, KS.

## ORDER FINDING PERSONAL JURISDICTION OVER DEFENDANT BUT DISMISSING FOR FORUM NON CONVENIENS

JAMES A. PUSATERI, Bankruptcy Judge.

This proceeding is before the Court on the motion of defendant Barclays Bank PLC (Barclays) to dismiss for improper service of process, lack of personal jurisdiction, or *forum non conveniens.* Barclays appears by counsel N. Larry Bork. Plaintiff Donald G. Atteberry, DVM, P.A. (Atteberry), appears by counsel J.B. King. The Court has reviewed the pleadings and is now ready to rule.

### FACTS

The following facts are uncontroverted. Atteberry's president negotiated a contract with two men, then residents of England, who represented themselves to be agents of the Nigerian National Petroleum Corporation (NNPC). Together, the men as individuals and NNPC were identified in the contract as "Buyer." Atteberry agreed to supply two thousand cattle embryos per year for five years and implant them into "Buyer's" cattle in return for $1.6 million per year. Atteberry guaranteed "a rate of ninety percent (90%) live embryos post-thaw," but disclaimed any warranties of pregnancy or live-birth rates.

Before the contract was signed, the men required Atteberry to deposit money with Barclays for the advance payment of taxes on the funds Atteberry was to receive under the contract. The contract itself does not mention this requirement. Sending deposits on a number of occasions, Atteberry's president wire transferred a total of $800,000 from banks in Kansas to one or more of Barclays' offices in London, England, directing its deposit into the men's individual accounts. Atteberry claims it was told the money would be transferred from the individual accounts into a central escrow account. However, the $800,000 was never placed in escrow and has apparently been withdrawn. The two men apparently now reside in Lagos, Nigeria.

Atteberry further alleges Barclays' agent had agreed to hold the money in an escrow account and failed to do so, and seeks to recover its loss from Barclays for breaching the purported escrow contract. Barclays denies making any such agreement, and the agent who is supposed to have made the agreement denies ever having met Atteberry's president or anyone else representing Atteberry. Atteberry has not indicated where it reached its agreement with Barclay's agent, except to concede through silence that it was not in Kansas, or even the United States.

When Atteberry filed this proceeding, it mailed the summons and complaint to "Attn: Legal Department, Barclays Corp NY." Although Barclays has a branch office in New York and clearly became aware of this proceeding, it questions the sufficiency of this service on the grounds there is no "Barclays Corp. NY" and the identified department is not Barclays' officer, managing or general agent, or an agent otherwise authorized by appointment or law to receive service for it. Atteberry responds that its counsel's legal assistant called Barclays' New York office and was told service could properly be made on Barclays in the manner used.

## CONCLUSIONS OF LAW

The Court first notes that it must agree with Barclays that the service on it probably did not satisfy the requirements of Federal Rule of Bankruptcy Procedure 7004(b)(3). Since Barclay's obviously received actual notice of the suit, however, the Court would be inclined to permit Atteberry to remedy this technical shortcoming. Given the Court's ultimate decision to dismiss the case, though, this issue will be rendered moot.

■ Barclays first questions the Court's personal jurisdiction over it by arguing it has insufficient contacts with the State of Kansas to create jurisdiction under the Due Process Clause of Fifth Amendment to the United States Constitution. It relies largely on three decisions by district court judges in this district, two by Judge Kelly and one by Judge Saffels. *See Wichita Federal Savings & Loan Assn. v. Landmark Group, Inc.*, 657 F.Supp. 1182 (D.Kan.1987); *Wichita Federal Savings & Loan Assn. v. Landmark Group, Inc.*, 674 F.Supp. 321 (D.Kan.1987); *Farr v. Designer Phosphate and Premix Int'l, Inc.*, 777 F.Supp. 890 (D.Kan.1991). As Atteberry points out, however, this Court has previously declined to follow the reasoning of those cases and instead, although the Tenth Circuit has not yet decided the issue, followed the rulings of all the circuit courts which have, and concluded the only requirement was that the defendant have minimum contacts with the United States. *American Freight System, Inc., v. W.A. Walker & Assoc., Inc. (In re American Freight System, Inc.)*, Case No. 88–41050–11, Adv. No. 90–7339 (Bankr.D.Kan. July 23, 1991, reconsideration denied Aug. 19, 1991); see 4 Wright & Miller, Fed.Prac. & Pro., Civil 2d, § 1067.1 at 311–12, n. 24 (1987) and 1992 pocket part at 26, n. 24 (citing circuit cases).

Since issuing its *AFS v. W.A. Walker,* decision, the Court has discovered that another district judge in this district, Judge Crow, had followed a national contacts test before Judges Kelly and Saffels used a different test. *Pioneer Properties, Inc., v. Martin,* 557 F.Supp. 1354, 1358–59 (D.Kan. 1983). The Court further notes that in a different context, the Tenth Circuit has rejected the theory that due process prevents a federal court from acquiring personal jurisdiction over a defendant who has no contacts with the state where the court happens to sit. *Quinones v. Pennsylvania General Ins. Co.*, 804 F.2d 1167, 1177–78 (10th Cir.1986) (district court had jurisdiction over third-party defendant who was served within 100–mile bulge area established by FRCP 4(f)).

■ This case does present a problem not involved in the *AFS v. W.A. Walker* case. Barclays' involvement in the transaction—including those portions which Atteberry alleges and Barclays denies—apparently took place entirely in London, England. At least, Atteberry has not indicated that Barclays did anything anywhere else. This raises a question that has been characterized as involving "general" rather than "specific" personal jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–19, 104 S.Ct. 1868, 1871–74, 80 L.Ed.2d 404 (1984) (concerning Fourteenth Amendment limitations on state court jurisdiction). "Specific jurisdiction" refers to a court's exercise of personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum while "general jurisdiction" refers to a court's exercise of personal jurisdiction over a defendant in a suit not connected to those contacts. 466 U.S. at 414, nn. 8–9, 104 S.Ct. at 1872, nn. 8–9. While the Court believes a federal question suit involving defendants which reside in the United States raises no minimum contacts question, the situation in this case is so analogous to the cases under the Fourteenth Amendment where a state seeks to assert jurisdiction over a non-resident defendant that the Supreme Court cases on that question provide guidance here.

So far as the matters presented to the Court indicate, Barclays' only contact with the United States in connection with Atteberry's claim was that it received in London Atteberry's wire transfers originated by Kansas banks. In *Helicopteros,* the

Supreme Court rejected a defendant's acceptance of checks drawn on a bank in the forum as a basis for exerting jurisdiction over the defendant, at least so long as the defendant had exercised no influence over the choice of the bank. 466 U.S. at 416–17, 104 S.Ct. at 1872–74. The Court ultimately concluded the defendant in *Helicopteros* had insufficient contacts with the forum to make maintenance of the suit against it there comport with traditional notions of fair play and substantial justice. 466 U.S. at 413–19, 104 S.Ct. at 1871–74. An earlier case, though—distinguished in *Helicopteros*—involved a situation more like the one now facing this Court. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In that case, the Supreme Court recited the following facts as sufficient to permit the State of Ohio to exercise personal jurisdiction over the Benguet Consolidated Mining Company under the Due Process Clause of the Fourteenth Amendment:

> The company's mining properties were in the Philippine Islands. Its operations there were completely halted during the occupation of the Islands by the Japanese. During that interim the president, who was also the general manager and principal stockholder of the company, returned to his home in Clermont County, Ohio. There he maintained an office in which he conducted his personal affairs and did many things on behalf of the company. He kept there office files of the company. He carried on there correspondence relating to the business of the company and to its employees. He drew and distributed there salary checks on behalf of the company, both in his own favor as president and in favor of two company secretaries who worked there with him. He used and maintained in Clermont County, Ohio, two active bank accounts carrying substantial balances of company funds. A bank in Hamilton County, Ohio, acted as transfer agent for the stock of the company. Several directors' meetings were held at his office or home in Clermont County. From that office he supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines and he dispatched funds to cover purchases of machinery for such rehabilitation. Thus he carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company. He there discharged his duties as president and general manager, both during the occupation of the company's properties by the Japanese and immediately thereafter. While no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons.

342 U.S. at 447–48, 72 S.Ct. at 419–20. In the case before the Court, although Barclays has only addressed the question of its contacts with the State of Kansas, it appears the bank, through its branch office in New York City, is carrying on a substantial portion of its business there, presumably maintaining depositors' accounts, loaning money, and performing other ordinary banking business. The Court concludes that Barclays, much like the mining company in *Perkins v. Benguet*, "carr[ies] on in [the United States] a continuous and systematic, but limited, part of its general business." 342 U.S. at 414, 72 S.Ct. at 405. Even though the applicable Constitutional provision here is the Due Process Clause of the Fifth Amendment, the Court believes Barclays' contacts with the United States are sufficient to permit a federal court to exercise general personal jurisdiction over the bank.

■ Nevertheless, although the Court believes it can properly exert personal jurisdiction over Barclays, the Court also believes this proceeding should be dismissed under the *forum non conveniens* doctrine. In *Piper Aircraft Company v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the Supreme Court reconfirmed the propriety of the doctrine. Before the doctrine can apply, the Court indicated an adequate alternative forum must be available for the lawsuit. 454 U.S. at 254 n. 22,

102 S.Ct. at 265 n. 22. The parties have not addressed this requirement, perhaps both recognizing that English courts satisfy it. Indeed, it would be surprising to hear anyone seriously contend the court system upon which our own was largely based is not adequate to deal with a breach of contract action. *Cf. H.K. Enterprises, Inc., v. Royal Inter'l Ins. Holdings Ltd.,* 766 F.Supp. 581, 583 (N.D.Ohio 1991) (parties agreed English courts could provide alternative forum and court could not conclude they were inadequate simply because rules on juries, contingent fees, and discovery are different than in U.S.). The Supreme Court noted certain private and public interests to be considered in applying the doctrine. The Court said:

> The factors pertaining to the private interests of the litigants included the "relative ease of access to sources to proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *[Gulf Oil Corp. v.] Gilbert,* 330 U.S. [501,] 508 [67 S.Ct. 839, 843, 91 L.Ed. 1055 1947]. The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.,* at 509 [67 S.Ct. at 843].

454 U.S. at 241, n. 6, 102 S.Ct. at 258, n. 6.

The private interest factors favor litigating this case in England. At this time, it appears only five people would be likely to be potential witnesses regarding the debtor's claims: the debtor's president, the two men who negotiated with him, Barclay's officer in London with whom the debtor allegedly negotiated, and a representative of the Nigerian National Petroleum Corporation. The debtor's documents regarding the transaction are presumably here and Barclays' in London, but the relatively few and simple transactions at issue probably generated few documents so transporting them should be no great burden on either party. On the other hand, the witnesses who would not be agents of the parties are apparently located in Nigeria, which is much closer to England than to the United States, so it should be somewhat cheaper to bring them to England, assuming they would be willing witnesses. If they would not be willing, England could make a stronger claim to compelling their attendance at trial than this Court could since their contacts with Atteberry apparently all occurred in London and nothing presented to the Court indicates the two men or the NNPC have ever been to or transacted business in the United States. The parties agree no view of premises would be required in this case.

The public interest factors point much more strongly to England as the proper forum for this suit. Court congestion does not appear to be particularly relevant, but the Court believes England has a much stronger interest than the United States in having this controversy decided there. Banks are an integral part of modern economies, and sovereigns have a special interest in controlling the activities of those banks which operate under their authority and preventing foreign powers from trying to control the banks' essentially local activities. In addition, an American company that goes overseas to make business deals should not expect to be able to bring all disputes that arise from that business to American courts, and the foreign people and businesses with whom they deal should not have to fear being sued here for activities conducted completely outside the United States which have no effect here except indirectly through the American company. In fact, but for Barclays' New York branch office, not involved in the debtor's transaction at all, Barclays could reasonably expect that U.S. courts would not even have jurisdiction over it on contracts which have

no more connection to this country than the one alleged here. There seems no doubt the law of England would apply to the debtor's claimed escrow agreement with Barclays, and the courts—and for that matter the attorneys—in England are much more familiar with the laws that govern contracts and banks there, and have far greater access to the research materials needed to resolve any disputed points. While English contract law may be very similar to ours, it seems possible that special banking laws would govern the alleged contract. The Court is aware that extensive and complex laws govern the operation of banks in this country, and assumes the same is probably true in England. These factors weigh heavily in favor of England as the proper forum for this suit.

In sum, Atteberry traveled to England, purportedly made a contract there for Barclays to act as an escrow agent there, wired money there, somehow lost its money there, and now wishes to force this almost totally foreign controversy to the United States for trial. Atteberry can bring the suit here only because it is in bankruptcy and Barclays has a branch office in New York. The Court must conclude England would provide a far more convenient forum for the suit.

For these reasons, although the Court will not dismiss for improper service of process or lack of personal jurisdiction, the Court concludes this proceeding must be dismissed under the doctrine of *forum non conveniens*.

IT IS SO ORDERED.